[734 NYS2d 25]

D & L Holdings, LLC, Respondent, v RCG Goldman Company, LLC, Appellant.

First Department, December 6, 2001

### APPEARANCES OF COUNSEL

*Herbert Rubin* of counsel, New York City (*Kevin Vernick, Charles Crum* and *Linda M. Brown* on the brief; *Herzfeld & Rubin, P. C.,* attorneys), for respondent.

*Kevin L. Smith* of counsel, New York City (*Adam S. Grace* on the brief; *Stroock & Stroock & Lavan, L. L. P.,* attorneys), for appellant.

### OPINION OF THE COURT

Saxe, J.

Plaintiff D & L Holdings, LLC (D&L), in an ongoing attempt to gain possession of a property located at 34-36 West 32nd Street, despite its inability to pay for it, has brought this action seeking a declaration that the transaction between the parties was actually a mortgage, in order to entitle plaintiff to claim a right of equitable redemption of the property. Upon review of the submissions we conclude that defendant's dismissal motion should have been granted by the motion court. The parties' transaction, which is unambiguously set forth in the submitted documents, does not create a mortgage interest, and, in any event, plaintiff's claim should have been precluded on the ground of judicial estoppel, based upon assertions made by plaintiff during a prior bankruptcy proceeding.

*Facts*

On June 22, 2000, D&L entered into a contract for the purchase of the subject property, being sold at auction by a bankruptcy trustee, for the purchase price of $8.6 million, under which D&L deposited $860,000 in escrow as a down payment. The closing was set for August 11, 2000, but on August 10, 2000, D&L was unprepared to close. D&L and the bankruptcy trustee then entered into an "Amendment to the Purchase Agreement" which increased the purchase price to $8.7 million, increased the down payment by $140,000 to $1 million, and provided that the down payment, rather than being held in escrow, would be released to the trustee to be retained as liquidated damages in the event that D&L defaulted. The Amendment extended the closing date to August 18, 2000 and provided that time was of the essence.

D&L still lacked the resources to close on the purchase of the property by the August 18, 2000 date, and, in order to avoid a forfeiture of its $1 million down payment, it turned to defendant RCG Goldman Company, LLC, for assistance. Three documents memorialize the parties' transaction. First, pursuant to an assignment dated August 18, 2000, D&L assigned to RCG all its rights, title and interest in the Purchase Agreement. Second, D&L and RCG entered into a lease, also dated August 18, 2000, providing that D&L would have a six-month leasehold interest with an option to purchase thereafter. Third, the parties executed a Closing Instruction Letter or escrow agreement pursuant to which RCG agreed to advance the sums to be paid by D&L upon closing, with the lease to be held in escrow pending D&L's satisfaction of certain closing conditions (the escrow conditions), which included D&L's payment of approximately $1.3 million to obtain the option to purchase, by August 22, 2000, time being of the essence. The escrow agreement further provided that in the event the closing conditions were not satisfied, the lease would be deemed null and void *ab initio*. Having entered into this agreement, on August 18, 2000 defendant RCG paid the remaining $7.7 million due on the contract to purchase the property pursuant to D&L's assignment of rights, and acquired title.

On August 22, 2000, lacking the funds needed to fulfill the escrow conditions allowing it to obtain the contemplated lease with the option to purchase from RCG, D&L filed a petition in Bankruptcy Court for Chapter 11 relief. It acknowledged that it was doing so "to exercise its rights under section 108 (b) of the Bankruptcy Code to extend the August 22, 2000 deadline

for 60 days."* That is, despite its inability to satisfy the escrow condition contained in the parties' Closing Instruction Letter, namely, that it pay to RCG $1.3 million for the purchase option by that day's deadline, D&L was still attempting to maintain its rights to obtain the leasehold and purchase option on the property.

The Bankruptcy Court, by order dated October 17, 2000, provided D&L with the 60-day extension permitted by Bankruptcy Code (11 USC) § 108 (b), setting a deadline of October 20, 2000, for D&L to satisfy all of the escrow conditions contained in the parties' escrow agreement, and to obtain court approval for any financing, sale or other action to be taken in connection with the satisfaction of the escrow conditions.

However, when that deadline passed, D&L sought a further three-week extension of its time to satisfy the escrow conditions. The Bankruptcy Court had the authority to grant such a further extension under Bankruptcy Code § 105 as a matter of equity, upon a balancing of the hardships on the parties.

In the course of seeking this further three-week extension of its time to satisfy the escrow conditions and obtain the lease and purchase option, on October 23, 2000, D&L proposed to the Bankruptcy Court that it would recompense RCG for the hardships caused by this additional delay by paying RCG $3,000 a day for the first week and $4,000 per day for the second and third weeks of that period. Not yet satisfied, the court repeatedly questioned what would happen if D&L still could not meet its obligations following the expiration of the 21-day extension. In response, D&L made three principal representations to the Bankruptcy Court:

(1) D&L's counsel stated that if the purchase did not go through by then, "I would not come back before you, Judge";

(2) D&L's counsel described, in open court, the extension as similar to "an option to buy something. You didn't exercise the option; it's finished; you have no recourse";

(3) when the court asked, "Before you go further. What happens at the end of the 21 days, will the Debtor be willing to walk away at that time?" Counsel responded: "Finish."

Based upon these responses, the Bankruptcy Court, by order dated November 6, 2000, granted D&L a further extension,

---

* Section 108 (b) (11 USC § 108 [b]) provides that a debtor in default under a contract may be granted an additional period of up to 60 days from the filing of a bankruptcy petition in which to cure its default.

until November 13, 2000, to comply with the parties' escrow conditions. However, D&L was still unable to comply with the escrow conditions as of the twenty-second day, and the Bankruptcy Court, by order dated December 4, 2000, dismissed the bankruptcy petition with prejudice.

D&L's next stratagem was to commence the present action on November 30, 2000, seeking, *inter alia*, a declaration that the transaction between the parties with respect to 34-36 West 32nd Street constituted an equitable mortgage, and for injunctive relief directing that RCG convey the property to D&L and accept a mortgage "upon satisfaction of all necessary requirements pursuant to the agreements of the parties." In other words, D&L now asserts that the parties' arrangement regarding the West 32nd Street property was in fact a financing arrangement by which RCG forwarded the funds in order for D&L to obtain the property, with RCG holding title only to protect its security interest as mortgagee. In claiming the position of mortgagor, D&L seeks the right to the protections afforded by law to a mortgagor, including the equity of redemption, which permits it to redeem the property by making payment of the debt owed to the mortgagee, a right which may only be extinguished by a valid foreclosure sale under RPAPL article 13 (*see, Finance Inv. Co. v Gossweiler*, 145 AD2d 463). A determination that RCG was merely providing the financing for D&L's purchase of the West 32nd Street property would mean that the three documents containing the terms of the parties' transaction were in fact a mortgage agreement, and D&L's right to "redeem" the property, i.e., obtain title from RCG by paying all sums owed to RCG under the agreement, would continue to remain viable, despite the time limits stated in the agreement, until such time as RCG commenced a foreclosure action under RPAPL article 13, and a sale of the property was held pursuant to a judgment of foreclosure and sale.

RCG moved to dismiss on grounds of res judicata and judicial estoppel, and based upon a defense founded upon documentary evidence, contending that the documents themselves unquestionably establish that the nature of the parties' transaction was an absolute sale and conditional resale rather than a mortgage.

On RCG's motion to dismiss, the motion court held that parol evidence was necessary to determine whether the parties' transaction created a mortgage or a conditional sale. We disagree, concluding that the submitted documents set forth the exact and complete nature of the transaction, properly

termed an absolute sale and conditional resale. These established, unambiguous facts support the exclusion of parol evidence, and require that the action be dismissed.

*The Nature of the Transaction*

D&L relies upon the rule that "[a] deed conveying real property, although absolute on its face, will be considered to be a mortgage when the instrument is executed as security for a debt" (*Basile v Erhal Holding Corp.*, 148 AD2d 484, 485, *lv denied* 75 NY2d 701). A court of equity "looks beyond the terms of the instrument to the real transaction" and, "so long as the instrument is one of security, the borrower has in a court of equity a right to redeem the property upon payment of the loan" (*Peugh v Davis*, 96 US 332, 336, 337).

As the Court of Appeals noted in *Matthews v Sheehan* (69 NY 585, 590), "[i]t is sometimes difficult to determine whether a transaction constitutes a mortgage or an absolute sale and a conditional resale." There are certainly transactions where, although one party has provided the payment made for a purchase of property and has taken title to the property, there are other indicia that the parties intended the nominal titleholder to possess a mortgagee's interest (*see, e.g., Zivotosky v Max*, 190 Misc 1044, *affd* 276 App Div 792). However, in such situations, introduction of parol evidence is permitted in order to determine the parties' true intent precisely because of those other indicia, such as where the documents alone paint an incomplete picture of a transaction dubious on its face, for instance a conveyance of title to property for a stated consideration less than 10% of the prior purchase price (*see, Zivotosky, supra*), or a bare assignment of a life insurance policy without written explanation (*see, Matthews v Sheehan*, 69 NY 585). Here, in contrast, the intended terms and purpose of this option arrangement are fully established by the documents themselves (*see, e.g., Marsh v McNair*, 99 NY 174, 178-180).

The documents establishing the terms of the parties' transaction amount to far more than the type of bare deed that leads to the foregoing rule that a deed must be deemed a mortgage when it is held as security for a debt. This commercial transaction, between sophisticated parties each of which was represented by counsel, is fully and unambiguously described in the documents themselves. They establish a purchase of property by RCG pursuant to an assignment of D&L's rights, with D&L having a right, conditioned upon payment of the agreed consideration within the stated time, to a six-month lease of the property with an option to purchase. This clear arrangement cannot be twisted into a mortgage.

A mortgage is defined as " '[a]ny conveyance of land intended by the parties at the time of making it to be a security for the payment of money or the doing of some prescribed act' " (*Burnett v Wright*, 135 NY 543, 547 [citation omitted]; *see*, 2 Rasch, New York Real Property § 33:1, at 476 [2d ed]). The parties' agreement, as a matter of law, sets forth a transaction that is not a mortgage. RCG was not providing funds to finance D&L's purchase of the subject property, thereby creating a debt on D&L's part that would be secured by the property. RCG was itself purchasing the property, though leaving D&L the option to purchase it at a future date, upon timely payment made to obtain that purchase option. This was what the Court of Appeals has termed an "absolute sale and a conditional resale" (*see, Matthews v Sheehan*, 69 NY 585, 590, *supra*; *see also, Hill v Grant*, 46 NY 496). Indeed, at the moment RCG purchased the property, D&L had absolutely no contractual obligation or debt regarding the property. All D&L then had was a conditional right to obtain an option to purchase the property at a later date.

In addition, the court's reasoning that it must look beyond the terms of the instrument because "equity abhors a forfeiture" fails to recognize that the only forfeiture at issue was the same absolute loss of its $1 million down payment that D&L would have experienced on August 18, 2000 had it failed to find some other means of arranging, as it did, for a future possibility of a right to purchase the property despite its present lack of the means to do so.

*Judicial Estoppel*

■ Furthermore, we hold that D&L is judicially estopped from asserting any right of redemption. While the doctrine has been said to " 'preclude[ ] a party who assumed a certain position in a prior legal proceeding *and who secured a judgment in his or her favor* from assuming a contrary position in another action simply because his or her interests have changed' " (*Jones Lang Wootton USA v LeBoeuf, Lamb, Greene & MacRae*, 243 AD2d 168, 176, *lv dismissed* 92 NY2d 962, quoting *Ford Motor Credit Co. v Colonial Funding Corp.*, 215 AD2d 435, 436 [emphasis added]), this rule has, properly, been applied as well to court rulings that are not denominated as "judgments" (*see, All Terrain Props. v Hoy*, 265 AD2d 87, 93; *Maas v Cornell Univ.*, 253 AD2d 1, 5, *affd* 94 NY2d 87).

Indeed, the doctrine of judicial estoppel is intended to prevent abuses of the judicial system by which a party obtains relief by maintaining one position, and later, in a different action, maintains a contrary position (*see, Environmental*

*Concern v Larchwood Constr. Corp.*, 101 AD2d 591, 593). This policy would not be served by limiting its application to cases where the legal position at issue was ruled upon in the context of a judgment.

Moreover, although the bankruptcy petition was ultimately dismissed, D&L actually achieved the relief it sought from that court. The purpose of D&L's proceeding in Bankruptcy Court was not to declare bankruptcy and obtain relief from its debts, but to obtain an extension of its time to exercise its rights under the lease/option, first under Bankruptcy Code § 108 (b), then under section 105. The rulings in which these applications were granted should be treated as the equivalent of a judgment, because they constituted the full grant of the relief that D&L had sought from that court.

The position taken by D&L before the Bankruptcy Court on October 23, 2000, was that if the court granted it the second sought extension of its time to satisfy the escrow conditions and obtain the lease and option to purchase, D&L would have no further right to assert an interest in the West 32nd Street property when the period of the extension expired. Specifically, in making the application, D&L asserted that without the sought extension it would lose its $1 million deposit and "the deal itself." Then, in open court, D&L's counsel clearly explained to the client that if D&L failed to satisfy the escrow conditions within the 21-day extension, "You didn't exercise the option; it's finished; you have no recourse." That is, D&L was acknowledging that it could claim no further rights regarding the lease/option if it could not satisfy the conditions within the new 21-day period.

These assertions were made in order to persuade the Bankruptcy Court to grant the additional, extraordinary extension of D&L's time to satisfy the escrow conditions, despite the apparent prejudice caused to RCG by these extensions, which prevented RCG from leasing the property to some other party. Application of the doctrine of judicial estoppel here does not require that the Bankruptcy Court have explicitly stated its reliance upon D&L's representations, since it is clear that the Bankruptcy Court only granted the further extension in reliance on the representation that D&L would pay RCG the sums agreed upon to compensate RCG for the harm caused it by the delay, *and* that once the second, 21-day extension period expired on November 13, 2000, there could be no further claims made by D&L against the property (*see, Kimco of N. Y. v Devon*, 163 AD2d 573).

It is of no moment that the remarks were made by counsel rather than D&L's representative. The statements were made in open court in order to unmistakably clarify the parties' understanding of the terms upon which D&L sought the extraordinary relief.

Finally, D&L's third cause of action, in which it is claimed that RCG violated the implicit terms of the agreement by denying D&L access to the property so it could be shown to prospective purchasers or lenders, should have been dismissed as well. The covenant of good faith and fair dealing cannot be used to add a new term to a contract, especially to a commercial contract between two sophisticated commercial parties represented by counsel. Obtaining access is not an implicit right held by a party possessing a conditional right to purchase a property. Indeed, it is common for purchasers of property to obtain financing without the lender visiting the property, particularly where, as here, the property is commercial in nature, for which complete financial documents are maintained in the ordinary course of business.

Accordingly, the order of the Supreme Court, New York County (Robert Lippmann, J.), entered July 2, 2001, which denied RCG's motion to dismiss the complaint pursuant to CPLR 3211 (a), should be reversed, on the law, with costs, and the motion granted. The Clerk is directed to enter judgment in defendant's favor dismissing the complaint.

SULLIVAN, P. J., NARDELLI, TOM and FRIEDMAN, JJ., concur.

Order, Supreme Court, New York County, entered July 2, 2001, reversed, on the law, with costs, and the motion to dismiss the complaint granted.